IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| LYLA STEPHENS, | ) | CIVIL NO. 22-00046-SOM-KJM |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING DEFENDANT'S |
| | ) | MOTION TO COMPEL ARBITRATION |
| vs. | ) | AND DISMISSING ACTION |
| | ) | |
| | ) | |
| EXPERIAN INFORMATION | ) | |
| SOLUTIONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ORDER GRANTING DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND DISMISSING ACTION**

## I.          INTRODUCTION.

Plaintiff Lyla Stephens signed up for CreditWorks, an online credit monitoring product provided by consumerinfo.com dba Experian Consumer Services ("CI/ECS"). CI/ECS, which is not named as a party, is affiliated with Defendant Experian Information Solutions, Inc. ("Experian"). According to the Complaint, Experian prepared a credit report on Stephens that she got through Creditworks. She noticed that the report inaccurately reported debts that she says had been discharged in her bankruptcy proceeding. On January 31, 2022, Stephens filed the Complaint in this matter, asserting that Experian had violated the Fair Credit Reporting Act ("FRCA"), 15 U.S.C. § 1681, by inaccurately reporting those discharged debts and by failing to have reasonable procedures in place to ensure accurate reporting of her debts. *See* ECF No. 1.

Experian moves to compel arbitration.  Because Stephens's FRCA claims are covered by a valid arbitration agreement, this court grants the motion and dismisses this case.

**II.      BACKGROUND.**

On August 31, 2015, Stephens filed for bankruptcy under Chapter 13 in the United States Bankruptcy Court for the District of Hawaii.  *See* ECF No. 1, PageID # 11.  She says that, on April 13, 2021, the Bankruptcy Court discharged her unsecured dischargeable debts, meaning that she no longer owed anything on those debts.  *Id.*, PageID # 12.

On or about August 18, 2021, Stephens says she enrolled in CreditWorks by CI/ECS to monitor her credit.  *See* Decl. of Lyla Stephens, ECF No. 33-1, PageID #s 354-55.  The Terms of Use Agreement between Stephens and CI/ECS in effect at the time of her enrollment says that CreditWorks "provides you a means to review your personal finance and/or credit information," including one's credit score, loan and credit card monthly payment, total debt amount, and interest rates.  ECF No. 21-5, PageID # 219 (copy of Terms of Use Agreement (Revised February 11, 2021)).

There is no dispute that Stephens used CreditWorks by CI/EIS to obtain a credit report prepared by Experian.  While Stephens's opposition to the present motion states that she obtained her credit report on August 17, 2021, the day before she

says she enrolled in CreditWorks, her citation to paragraphs 59 to 64 of the Complaint does not support her receipt of a credit report on August 17, 2021.  *Compare* ECF No. 33, PageID # 328, *with* ECF No. 1, PageID #s 13-14.  The record does reflect that Stephens did indeed receive her Experian credit report through CreditWorks, but not on the date cited.  *See* Decl. of Kimberly Cave, ECF No. 21-2, PageId # 207-09 (indicating that before filing this action, Stephens did not directly ask Experian for a credit report, meaning that her credit report came through another source); Williams Decl., ECF No. 21-3, PageID # 215 ("Plaintiff learned how [Experian] was reporting the HawaiiUSA Federal Credit Union accounts through her CreditWorks subscription.").  *See also* ECF No. 38, PageID # 436 (taking no issue with Experian's argument that the present dispute began when Stephens's obtained her consumer report from the CreditWorks website).  This court concludes that Stephens is mistaken as to the date she enrolled in CreditWorks and/or the date she received the credit report, as she must have received her credit report after she enrolled in Creditworks.

Experian is a CI/ECS affiliate.  Decl. of David Williams, ECF No. 21-3, PageID #s 211-12 (indicating that Experian is a CI/ECS affiliate, and that both are wholly owned by Experian Holdings, Inc.).

To enroll in CreditWorks, Stephens completed a webform asking for her name, address, phone number, and email address. *See* Williams Decl., ECF No. 21-3, PageID # 212.  An example of the webform required to create such an account is filed as ECF No. 21-4, PageID # 217.  The form says that clicking the "Create Your Account" box indicates acceptance of and agreement to the "Terms of Use Agreement," viewable in a new window by clicking on the blue text hyperlink on the page.  *Id.*; Williams Decl., PageID #s 212-13.  Stephens had to click the "Create Your Account" button to enroll in CreditWorks.  *See* Williams Decl, ECF No. 21-3, PageID # 213 ("Plaintiff clicked the 'Create Your Account' button, thereby accepting and agreeing to the Terms of Use Agreement.  I know this to be true because Plaintiff would not have been able to successfully enroll in CreditWorks unless she clicked the button."); *see also* ECF No. 33, PageID # 329 ("Plaintiff was required to input her information and then click on a button, label[]ed 'Create Your Account,' to finalize the transaction.").  Stephens does not say that she thereafter clicked on the hyperlink or even attempted to examine or read the Terms of Use Agreement.

The version of the Terms of Use Agreement (Revised February 11, 2021) before the court appears to contain screen shots of the pages of the Terms of Use Agreement.  Thus, the filed document has a very small font.  However, when this court

4

clicked on the hyperlink to examine the Terms of Use Agreement,
it appeared in a larger font in a document with no page breaks.
*See*

https://usa.experian.com/registration/?offer=at_frsas119&br=exp&o
p=FRSP-PRD-PCO-119-TBL-XXXXXXX-XX-EXP-VWIN-SEO-XXXXXX-XXXXXX-XXXX
X&dAuth=true (last visited June 29, 2022) (click on the hyperlink
to view the Terms of Use Agreement, which can be copied and
pasted into a word processing document or saved to a computer).

A copy of the Terms of Use Agreement in effect at the
time Stephens signed up for her CreditWorks account (Revised
February 11, 2021) is filed as ECF No. 21-5.  It states:

> You agree that by creating an account with
> ECS (as defined below), or accessing or using
> our Services (as defined below), website(s)
> (such as this website, usa.experian.com, or
> any affiliated website (including, but not
> limited to, **Experian.com,
> FreeCreditReport.com, FreeCreditScore.com,
> CreditReport.com, Creditchecktotal.com,
> CreditScore.com, usa.experian.com, and
> experian.experiandirect.com**)), or mobile
> applications (such as the Experian app), as
> well as any content provided or accessible in
> connection with the website(s) or mobile
> application(s), including information, user
> interfaces, source code, reports, images,
> products, services, and data . . . , you
> represent to ECS that you have read,
> understood, and expressly consent and agree
> to be bound by this Terms of Use Agreement,
> and the terms, conditions, and notices
> contained or referenced herein . . . .

ECF No. 21-5, PageID # 218.

The Terms of Use Agreement says that the words "we" and "us" and "ECS" mean:

> ConsumerInfo.com, Inc., an Experian® company (also known as Experian Consumer Services) and referred to as "Experian" on the Websites, its predecessors in interest, successors and assigns, and any of its third party service providers (including, without limitation, cloud service providers) who ECS uses in connection with the provision of the Services to you.

*Id.* That definition does not mention CI/ECS affiliates. *Id.*

The Terms of Use Agreement contains an arbitration clause:

> **DISPUTE RESOLUTION BY BINDING ARBITRATION**
>
> PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS.
>
> SUMMARY:
>
> MOST CUSTOMER CONCERNS CAN BE RESOLVED QUICKLY AND TO THE CUSTOMER'S SATISFACTION BY CALLING ECS'S CUSTOMER CARE DEPARTMENT AT 1-855-962-6943.  IN THE UNLIKELY EVENT THAT ECS'S CUSTOMER CARE DEPARTMENT IS UNABLE TO RESOLVE A COMPLAINT YOU MAY HAVE REGARDING A SERVICE OR WEBSITE TO YOUR SATISFACTION (OR IF ECS HAS NOT BEEN ABLE TO RESOLVE A DISPUTE IT HAS WITH YOU AFTER ATTEMPTING TO DO SO INFORMALLY), WE EACH AGREE TO RESOLVE THOSE DISPUTES THROUGH BINDING ARBITRATION OR SMALL CLAIMS COURT INSTEAD OF IN COURTS OF GENERAL JURISDICTION TO THE FULLEST EXTENT PERMITTED BY LAW.  ARBITRATION IS MORE INFORMAL THAN A LAWSUIT IN COURT.  ARBITRATION USES A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY, ALLOWS FOR MORE LIMITED DISCOVERY THAN IN COURT, AND IS SUBJECT TO VERY LIMITED REVIEW BY COURTS. ARBITRATORS CAN AWARD THE SAME DAMAGES AND RELIEF THAT A COURT CAN AWARD.  ANY ARBITRATION UNDER THIS AGREEMENT WILL TAKE

6

PLACE ON AN INDIVIDUAL BASIS; CLASS
ARBITRATIONS AND CLASS ACTIONS ARE NOT
PERMITTED.  ECS WILL PAY ALL COSTS OF
ARBITRATION, NO MATTER WHO WINS, SO LONG AS
YOUR CLAIM IS NOT FRIVOLOUS.  HOWEVER, IN
ARBITRATION, BOTH YOU AND ECS WILL BE
ENTITLED TO RECOVER ATTORNEYS' FEES FROM THE
OTHER PARTY TO THE SAME EXTENT AS YOU WOULD
BE IN COURT.

Arbitration Agreement:

(a) ECS and you agree to arbitrate all
disputes and claims between us arising out of
the Agreement directly related to the
Services or Websites to the maximum extent
permitted by law, except any disputes or
claims which under governing law are not
subject to arbitration.  This agreement to
arbitrate is intended to be broadly
interpreted and to make all disputes and
claims between us directly relating to the
provision of any Service and/or your use of
any Website subject to arbitration to the
fullest extent permitted by law.  The
agreement to arbitrate includes, but is not
limited to:

claims arising out of or relating to any
aspect of the relationship between us arising
out of any Service or Website, whether based
in contract, tort, statute (including,
without limitation, the Credit Repair
Organizations Act) fraud, misrepresentation
or any other legal theory; claims that arose
before this or any prior Agreement
(including, but not limited to, claims
relating to advertising); claims that are
currently the subject of purported class
action litigation in which you are not a
member of a certified class; and claims that
may arise after the termination of this
Agreement.

**For purposes of this arbitration provision,
references to "ECS," "you," and "us" shall
include** our respective parent entities,
subsidiaries, **affiliates** (including, without

7

limitation, our service provider, CSID),
agents, employees, predecessors in interest,
successors and assigns, websites of the
foregoing, as well as all authorized or
unauthorized users or beneficiaries of
Services and/or Websites or information under
this or prior Agreements between us relating
to Services and/or Websites.  Notwithstanding
the foregoing, either party may bring an
individual action in small claims court.  You
agree that, by entering into this Agreement,
you and ECS are each waiving the right to a
trial by jury or to participate in a class
action to the maximum extent permitted by
law.  This Agreement evidences a transaction
in interstate commerce, and thus the Federal
Arbitration Act governs the interpretation
and enforcement of this arbitration
provision.  This arbitration provision shall
survive termination of this Agreement.

.   .   .   .

All issues are for the arbitrator to decide,
including the scope and enforceability of
this arbitration provision as well as the
Agreement's other terms and conditions, and
the arbitrator shall have exclusive authority
to resolve any such dispute relating to the
scope and enforceability of this arbitration
provision or any other term of this Agreement
including, but not limited to any claim that
all or any part of this arbitration provision
or Agreement is void or voidable. . . .
Unless ECS and you agree otherwise, any
arbitration will take place in the county (or
parish) of your billing address.

ECF No. 21-5, PageID #s 220-21 (emphasis added).

The Terms of Use Agreement (Revised February 11, 2021)

provides that "[t]he arbitration will be governed by the

Commercial Dispute Resolution Procedures and the Supplementary

Procedures for Consumer Related Disputes (collectively, 'AAA

8

Rules') of the American Arbitration Association ('AAA'), as modified by this Agreement, and will be administered by the AAA." ECF No. 21-5.  The reference to "Commercial Dispute Resolution Procedures" appears to refer to AAA's "Commercial Arbitration Rules and Mediation Procedures."

https://adr.org/sites/default/files/CommercialRules_Web-Final.pdf

(last visited July 7, 2022).  Section R-7 of those rules provides:

> (a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.
>
> (b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part.  Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract.  A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

*Id.*

The Terms of Use Agreement (Revised February 11, 2021) provides that it may be amended and advises customers to "check this Website regularly for updates.  Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement. . . .  However, no unilateral amendment will retroactively modify the parties'

agreed-to dispute resolution provisions of this Agreement for
then-pending disputes, unless the parties expressly agree
otherwise in writing."  ECF No. 21-5.

         The version of the Terms of Use Agreement that took
effect after Stephens filed the present complaint continued to
contain an arbitration agreement extending to CI/ECS affiliates.
*See* ECf No. 21-6, PageID # 250.

         Stephens says that Experian's August 2021 credit report
reflected her bankruptcy and discharge information but
nevertheless failed to indicate a zero balance with respect to
two Hawaii USA Federal Credit Union unsecured loans.  She
complains that Experian reported that she still owed $11,337 and
$6,124 with respect to those unsecured loans notwithstanding her
bankruptcy discharge.  *See* ECF No. 1, PageID #s 12-14.

         On December 6, 2021, Stephens logged into her
CreditWorks account and ordered and received another credit
report.  *See* Williams Decl., ECF No. 34-1, PageID # 382.
Experian states that, by logging in that day, Stephens agreed to
be bound by the Terms of Use Agreement that was in effect on that
date (the version dated November 30, 2021), except with respect
to the dispute resolution provisions in the February 2021 Terms
of Use Agreement.  Unlike the February 2021 agreement, the
November 2021 agreement includes CI/ECS as well as its affiliates
in the definition of "we," "us," and "ECS."  *Compare* ECF No. 34-

2, PageID # 384 (November 2021 agreement defining "we," "us," and "ECS" as including CI/ECS and affiliates) *with* ECF No. 21-5 (February 2021 agreement defining "we," "us," and "ECS" without reference to affiliates).

Stephens's one-count Complaint asserts violations of the FCRA, 15 U.S.C. § 1681e(b), claiming that Experian failed "to use reasonable procedures to assure maximum possible accuracy of credit information pertaining to pre-bankruptcy debts after a consumer receives a Discharge Order." ECF No. 1, PageId # 17. The Complaint alleges that Experian knew that Stephens's debts had been discharged but nevertheless included those debts in her credit report. *Id.*, PageID #s 17-20.

## III.      ANALYSIS.

The Federal Arbitration Act ("FAA") "governs the enforceability of arbitration agreements in contracts involving interstate commerce." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013). Under the FAA, private agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Experian moves to compel arbitration of the present dispute under the FAA. *See* ECF No. 21. That motion is granted.

The Ninth Circuit recognizes three stages in the way a court treats a motion to compel arbitration under the FAA--1) a

motion to compel may be treated as akin to a motion to dismiss; 2) a motion to compel treated as a summary judgment motion may include optional discovery before resolution of the summary judgment motion; and 3) if a motion for summary judgment is denied, a mini trial may be held. *See Knapke v. PeopleConnect, Inc.*, 2022 WL 2336657, at *5 (9th Cir. June 29, 2022). The Ninth Circuit has recently explained:

> under the FAA's procedural framework, "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. "In applying this language, district courts rely on the summary judgment standard of Rule 56 of the Federal Rules of Civil Procedure." *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). As a result, "a court is not authorized to dispose of a motion to compel arbitration until after [material] factual disputes have been resolved." *Id.* at 671.

*Knapke*, 2022 WL 2336657, at *3.

Arbitration is a matter of contract, meaning that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). While there is a "liberal federal policy" favoring arbitration agreements, *see id.*, that policy was intended "'to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts.'" *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (quoting

*Granite Rock Co. v. Teamsters*, 561 U.S. 287, 302 (2010)).   Put another way, "[t]he policy is to make arbitration agreements as enforceable as other contracts, but not more so."   *Id.* (quotation marks and citation omitted).   This means that "a court must hold a party to its arbitration contract just as the court would to any other kind.   But a court may not devise novel rules to favor arbitration over litigation."   *Id.*

"'Generally, a court must determine two issues before deciding whether to compel arbitration: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute.'"   *Knapke*, 2022 WL 2336657, at *3 (quoting *Zoller v. GCA Advisors, LLC*, 993 F.3d 1198, 1201 (9th Cir. 2021)).   These gateway issues may be delegated to an arbitrator when the parties "clearly and unmistakably" provide for an arbitrator to decide them.   *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."); *see also Howsam*, 537 U.S. at 83 ("The question whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.*").*

The Ninth Circuit has found a clear and unmistakable

13

delegation of authority to decide gateway issues such as arbitrability when the parties incorporate the AAA rules into their agreement, including the provision that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

The arbitration agreement before this court states that "[a]ll issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement." ECF No. 21-5, PageID # 221. Additionally, the arbitration agreement provides that it shall be governed by AAA rules, which includes the provision that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." Applying *Brennan*, 796 F.3d at 1130, this court concludes that the parties have clearly and unmistakably delegated the issue of arbitrability to the arbitrator. The court therefore compels arbitration of Stephens's FRCA claims against Experian.

14

Stephens argues that any "arbitrator would simply send the case back to this court, unnecessarily delaying the resolution of Plaintiff's claims."  ECF No. 33, PageID # 351.  Stephens's argument rests on the premise that Stephens contracted with CI/ECS but is suing Experian, which did not sign any agreement requiring Stephens to arbitrate.  This court is not persuaded by Stephens that the arbitrator, who is authorized in the arbitration provision to determine the gateway issue of arbitrability, will send the matter back to this court.

Stephens had to click on a box that said, "Create Your Account" after the words, "**By Clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement**."  *See Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393, 394 (9th Cir. 2020) (describing "clickwrap" agreements in which website users consent to terms and conditions by clicking a box indicating "I agree").  A failure to read the terms of an agreement does not nullify those terms if the customer had a legitimate opportunity to read the terms.  *Id.* at 395; *see also Siopes v. Kaiser Found. Health Plan, Inc.,* 130 Haw. 437, 448, 312 P.3d 869, 880 (2013) ("The general rule of contract law is that one who assents to a contract is bound by it and cannot complain that he has not read it or did not know what it contained." (quotation marks and citation omitted)).

Experian seeks to enforce the arbitration agreement directly.  *See* ECF No 21-1, PageID# 193 ("EIS's status as a party to the Arbitration Agreement is beyond dispute").  Admittedly, Experian is not a party to the entire Terms of Use Agreement (Revised February 11, 2021) between Stephens and CI/ECS.  But while the Overview and Acceptance of Terms section of that agreement does not specifically refer to CI/ECS affiliates, the arbitration agreement contained in it includes affiliates in its definition of "ECS," "you," and "us."  That is, an arbitrator might or might not deem Experian to be included in the arbitration agreement even if not mentioned in other parts of the document.  Stephens does not establish that an arbitrator would refer that issue back to a court.

Even if an arbitrator determined that Experian could not enforce the arbitration agreement as a CI/ECS affiliate, the arbitrator could review whether Experian was a third-party beneficiary of the arbitration agreement.  "A third party beneficiary is one for whose benefit a promise is made in a contract but who is not a party to the contract." *Hunt v. First Ins. Co. of Hawaii*, 82 Haw. 363, 367, 922 P.2d 976, 980 (Ct. App. 1996) (quotation marks and citation omitted); Black's Law Dictionary 192 (11th ed. 2019) (defining "third-party beneficiary" as "Someone who, though not a party to a contract, stands to benefit from the contract's performance").

16

In this case, the Terms of Use Agreement contains a provision requiring disputes brought by and against affiliates to be arbitrated.  Stephens does not show that an arbitrator would necessarily determine that Experian cannot be a third-party beneficiary.  *See* ECF No. 33, PageID # 336 ("However, without obtaining a benefit of the Contract itself, Experian cannot be an intended beneficiary.").

Under Hawaii law, third parties do not have enforceable contract rights unless they are intended third-party beneficiaries of a contract provision.  *See Pancakes of Hawaii, Inc. v. Pomare Properties Corp.*, 85 Haw. 300, 309, 944 P.2d 97, 106 (Ct. App. 1997).  An incidental benefit is not sufficient to confer third-party beneficiary status.  *See Hunt*, 82 Haw. at 367. In *Eastman v. McGowan*, 946 P.2d 1317, fn.8 (1997), the Hawaii Supreme Court stated that "[a]n incidental beneficiary is defined in 4 Corbin, *Corbin on Contracts,* § 779C (1951) as 'a person who will be benefitted by the performance of a contract in which he is not a promisee, but whose relation to the contracting parties is such that the courts will not recognize any legal right in him."

An arbitrator examining whether Experian is a party to the Terms or Use Agreement between CI/ECS and Stephens would have available the language in the arbitration provision stating that "ECS and you agree to arbitrate all disputes and claims between

us arising out of this Agreement directly related to the Services or Websites to the maximum extent permitted by law," including "claims arising out of or relating to any aspect of the relationship between us arising out of any Service or website, whether based in contract, tort, statute . . . , fraud, misrepresentation or any other legal theory."  ECF No. 21-5, PageID # 221.

The arbitration agreement defines "ECS," "you," and "us" as including "our respective parent entities, subsidiaries, [and] affiliates."  *Id.*  Experian is a CI/ECS affiliate, as both are wholly owned by Experian Holdings, Inc.  *See* Williams Decl., ECF No. 21-3, PageID # 211-12; *see also* Black's Law Dictionary 72, 432 (11th ed. 2019) (defining "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation."; defining "sister corporation as "[o]ne or two or more corporations controlled by the same, or substantially the same owners"); https://corporatefinanceinstitute.com/resources/knowledge/strategy/affiliated-companies/ (last visited June 30, 2022) ("Affiliated companies are companies that are related through ownership, either with one owning the other as a minority shareholder or with multiple companies being owned by a third party.").

An arbitrator could also look at decisions by other courts determining that FCRA claims asserted against Experian arising out of credit monitoring through CreditWorks were subject to the arbitration agreement contained in CI/ECS's Terms of Use Agreement. *See Morgan v. Experian Information Solutions, Inc.*, 2022 WL 681359, at *1 (W.D. Wash. Mar. 4, 2022); *see also Sauer v. Experian Information Solutions, Inc.*, 2022 WL2163016, at *2 (C.D. Cal. Mar. 4, 2022) (determining that Experian and CI/ECS are "undeniably" affiliates because they are both wholly owned by Experian Holdings, Inc.).

Stephens's citation of *Meeks v. Experian Information Solutions, Inc.*, 2021 WL 5149066 (N.D. Cal. Nov. 5, 2021), is unavailing. While *Meeks* determined that Experian was not a party to the CI/ECS Terms of Use Agreement, it did not reach the issue of whether Experian was a CI/ECS affiliate such that it could enforce a similar arbitration agreement. Experian failed to make that argument in that case. *Id.* at *2.[1]

In short, an arbitrator might well determine the merits of Stephens's claim against Experian without returning any matter to this court. Stephens's assertion to the contrary is not supported by sufficient law or facts to weigh decisively here.

---

[1] Stephens additionally argues that the agreement is ambiguous because the FCRA is not specifically mentioned as a claim subject to arbitration. *See* ECF No. 33, PageID # 340. This court notes that the scope of the arbitration clause as applicable to all claims and disputes.

This court recognizes that, under Hawaii law, arbitration agreements, like all other contracts, may be invalidated by defenses such as fraud, duress, and unconscionability. *See Narayan v. The Ritz-Carlton Dev. Co.*, 140 Haw. 343, 350, 400 P.3d 544, 551 (2017); *see also Brennan v. Opus Bank*, 796 F.3d 1125, 1132 (9th Cir. 2015) ("Because a court must enforce an agreement that, as here, clearly and unmistakably delegates arbitrability questions to the arbitrator, the only remaining question is whether the particular agreement to delegate arbitrability—the Delegation Provision—is itself unconscionable."). Stephens argues that the arbitration agreement should be unenforceable because it is unconscionable. The Hawaii Supreme Court has stated:

> Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction.

*City & Cty. of Honolulu v. Midkiff*, 62 Haw. 411, 418, 616 P.2d 213, 218 (1980). Unconscionability encompasses two principles: unfair surprise and one-sidedness. *Balogh v. Balogh*, 134 Haw. 29, 41, 332 P.3d 631, 643 (2014)  Generally, a determination of unconscionability requires a showing that the contract was both procedurally unconscionable (unfair surprise) and substantively

unconscionable (one-sidedness). *Id.* However, "there may be exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Id.* (quotation marks and citation omitted).

"Procedural unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice." *Narayan*, 140 Haw. at 351, 400 P.3d at 552 (quotation marks and citation omitted). Accordingly, courts consider whether deceptive or high-pressure tactics were used, whether fine print was used, whether the court should step in given the experience and education of the person claiming unconscionability, and whether there is disparity in the parties' bargaining power. *Id.* Procedural unconscionability often involves adhesion contracts. *Id.* Here, there is no question that the agreement had some aspects of procedural unconscionability. It was a take-it-or-leave-it agreement, and the arbitration clause was buried several pages into the lengthy contract.

However, while the copy of the contract in the record is in a small font, the version available on the website is in a font that is easily readable. Additionally, the arbitration agreement is set off by a title in a larger, bolded font that states, "**DISPUTE RESOLUTION BY BINDING ARBITRATION.**" Nor does

Stephens claim to have clicked on the hyperlink that would have opened up a new window containing the Terms of Use Agreement. Stephens does not show that she has reason to complain that the arbitration clause was written in small font and buried in a lengthy agreement when she made no attempt to even look at it.

Stephens's argument that she enrolled in CreditWorks because her employer told her to do so is similarly unpersuasive. Stephens's subjective motivation for enrolling in CreditWorks is irrelevant to whether the Terms of Use Agreement is procedurally unconscionable.

Substantive unconscionability examines how one-sided the agreement is and whether the terms are unreasonably favorable to one party. *Id.* The arbitration agreement is not substantively unconscionable, as it applies equally to both parties. *See* ECF No. 21-5, PageID #s 220-21. Moreover, Experian reimburses any filing fee, and arbitration occurs in the county of the customer's billing address. *Id.*, PageID # 221. It is true that the Terms of Use Agreement could be amended unilaterally by CI/ECS. *See id*, PageID # 219 ("This Agreement may be updated from time to time. . . . Each time you order, access, or use any of the Services or Websites, you signify your acceptance and agreement . . . to be bound by the then current Agreement."). However, Stephens does not show that the terms were actually changed in any material way from the time she

signed up for her account.  Moreover, the arbitration clause itself could not be unilaterally altered.  The failure to show that the agreement unreasonably favored CI/ECS forecloses her argument that it was unconscionable.

**IV.      CONCLUSION.**

The court compels arbitration of Stephens's FCRA claims.  Because the entire action is subject to arbitration, this court dismisses the action without prejudice in lieu of staying it under 9 U.S.C. § 3.  *See Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1073–74 (9th Cir. 2014) ("We have held that, notwithstanding the language of § 3, a district court may either stay the action or dismiss it outright when, as here, the court determines that all of the claims raised in the action are subject to arbitration.").  This dismissal affects appellate rights.  *Id.* (indicating that an order compelling arbitration but staying a case is not immediately appealable, while an order compelling arbitration and dismissing the action is immediately appealable).

If either party subsequently files an action based on the same claim or institutes a proceeding to confirm or vacate an arbitration award relating to the subject of this case, the filing fee for that new action is waived, and the matter should be assigned to the undersigned district judge as a related case.

To ensure a waiver of any applicable filing fee, the filing party should direct the Clerk's Office to this order.

The parties are directed to contact the Magistrate Judge assigned to this case immediately to conduct a settlement conference.  To give the parties time to work with the Magistrate Judge, this court directs the Clerk of Court to wait until September 9, 2022, to enter judgment pursuant to this order. Judgment shall be entered on that date unless the Clerk of Court receives other direction from a judge.


IT IS SO ORDERED.

DATED: Honolulu, Hawaii, July 13, 2022.




/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge


*Stephens v. Experian Information Solutions, Inc.*, Civ. No. 22-004046 SOM-KJM; ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND DISMISSING ACTION